is Hatteberg v. Cundiff, and for the appellant is Mr. Tagg, and for the appellee, Ms. Dorino. You may proceed. May it please the Court, Counsel, I am Michael Tagg, and I'm presenting the appeal for the Hattebergs. Two parts to this appeal I want to address. The first is the dismissal of the negligence counts. What we believe the most important part of the facts in this case are that Cody Cundiff was on the Thomasboro Volunteer Fire Department, no question about that. He received a page that there had been an accident someplace south of the Thomasboro Fire Station, and he ultimately got in his sister's car to drive to the fire station. So the question to the Court is, was he in the process of having that status and responding to the emergency in his trip from his house to the fire station, or would the response to the emergency be once he received instructions, equipment, direction while actually at the fire department? Mr. Cundiff stated that when he got in his sister's car, he had full intent to obey all of the motor vehicle laws of the state of Illinois, wasn't going to speed to try to get there earlier, wasn't going to do anything, not stopping at traffic signs or anything else. So he was going to get to the fire station, then whatever the fire chief would decide, whatever would happen, would happen at that point in time. So we believe that this is akin to a firefighter going to work, going to the station. He was occasioned to go to the station because of the page, but until he got to the station, it was not in the process of responding to the emergency. Why would we have the tort immunity for people doing that? Now certainly once he gets to the station, we could have a whole bunch of different reasons why then, if he's asked to go in a fire truck, if he's asked to go in his own personal vehicle or other things. But in this case, there's no reason to say that he needed to bend rules or do other things to get to the fire station. I certainly could envision on other facts, maybe things would be different. If the fire chief called and said, you're going to be the first one there, you've got to hightail it over here, we're relying on you to get there first and get things ready so we can get out. Then within this context of the exigency, the necessity to hurry things up to get to the fire station, then perhaps the added pressure is put on the young man so that the reason for this particular immunity would apply. I certainly don't, didn't mean in my pleadings to say this was in the nature of a frolic, that he just was doing whatever he wanted to, that while called on this pager, his attention was diverted, he was going someplace else. What I meant to say is that as in a case where the fire truck is going out to get a cat out of a tree, the case that you folks decided many years ago, that I think is the controlling case, the Vargas case, that there are situations where as you look at the facts, is it within the parameter of this response. But even though he was going to the station, wasn't that important that he get to the station quickly? In case there was another call or whatever, or they needed to send additional vehicles to this fire? I don't think that there's any specific evidence in this record that he was told to hurry up. There's nothing of record in their bylaws or directions or training or anything that came out of this record that if you are called upon, you are to hightail it to the station, you are to report to the station and that he said he was going to actually follow all the traffic laws and not do anything to get there and bend those rules to do it. So I believe there are circumstances when that could be a factor, they're just not present in this case. Well, couldn't you argue that it's in the nature of a volunteer fireman that when the whistle blows, they get their lickety split? I think that what they're expected to do is when the whistle blows, they are not to dilly dally around. You wouldn't finish a conversation with your girlfriend on the cell phone before you got in the car to leave. You wouldn't decide to check your email before you leave. I think you are expected to respond with due dispatch, but that's a different question than if you are going to go 65 miles an hour rather than 55 miles an hour. If you're going to roll through the country stop sign if you don't see any traffic rather than obeying those laws and actually stopping and heeding to them. If you're going to possibly pass where there's a no passing yellow stripe to get around a slow moving vehicle even though there's a yellow line there if you think that there is sufficient evidence to do that. So I'm not arguing that, no, he just under their guidelines, under his own testimony, his father's testimony, that wasn't the expectation. Well, when you get around to it, you know, you get here a couple hours late, no problem. They wanted everybody to, within the realms of reasonableness, to come to the station as soon as practicable. But that practicable did not say, you know, you've got to hightail it there and you have to respond as though you were a firetruck with sirens blaring, police responding to an emergency and the like. The second part of our appeal involves the summary judgment of willful and wanton. So that irrespective of the fact that whether tort immunity applies or not for the negligence claims, that willful and wanton conduct still can provide a base of action. One of the cases cited by the appellee, the Joyner v. Birch case, dealt with a situation where somebody's come along, they hit the ice, they go out of control and there's an accident. The court, I think rightfully so, found, well, that's not willful and wanton, there was nothing at that point in time that the driver could do that would amount to a mental state of recklessness or making some conscious decision, both should be a conscious disregard or a conscious regard. What we have in this case is that the young man was coming down the road at some distance before the intersection. He sees the vehicle stopped at the intersection, begins to apply his brakes, begins to slide on ice. He says he tries it again, he slides on ice. At that point in time, it's not that I was out of control, at that point in time fate took the car where it was going to and I was along for the ride. He considered trying to stop again and hitting the vehicle in front of him was his expectation. To go to the right off of the road where there weren't any vehicles but he says there was a ditch. Or to steer the vehicle into the passing lane, not knowing if there's any oncoming traffic, what other traffic conditions were, an attempt to get around the stopped vehicle and then, as he says, I didn't hit the brakes again, look or steer, I hung on straight to try to get through that intersection as quickly as possible, which he was familiar with and had to traverse either six or eight lanes, turn lanes, that are all stacked up there to safely get across to where this traffic was. So again, I think what our appellate court, or what you folks have said, your appellate court has said in Barb's case, those are jury questions. The jury should have been able to consider all of the evidence and the testimony that I just told you about, what his choices were, what the actual ditch looked like, what the hazard was presented there to determine whether or not the conscious decision to go around and buzz through the intersection against oncoming traffic was a conscious disregard to that danger given the facts and circumstances that he had. The jury may conclude that it wasn't, but those are the questions that are just made for juries to decide those particular issues and this is one that I think a jury needs to make those decisions. Is there any dispute that he slid on ice? No. There's no dispute that he slid on ice. The two times, the only testimony was he said he tried to initially slow, he felt sliding, tried to slow again, he felt sliding, he didn't think he could get the vehicle stopped, but nevertheless he felt that the vehicle had slowed appreciably and then after he made the maneuver into the oncoming traffic lane, then he indicates that there was no attempt to brake at that point in time. So he slid on the ice, you say he could have gone into a ditch or whatever, but instead he chose to proceed on around the cars in front of him. How is that willful in one? The conscious decision to make that maneuver, the conscious, now obviously he was making these decisions quick, but he could have continued on to a hazard that would not have potentially been head-on collision or ultimately this very serious side swiping accident or could have gone into the ditch. This is nothing like Fargus. Fargus, the responder testified he stopped and looked and proceeded ahead, but the witnesses said no, no, he just went right through the stop sign. And that's why we sent that one back for, we reversed the summary judgment I think and sent it back for a jury trial. But this is not like that. It's not like the circumstance where there are two conflicting versions. We have the essence of one version with nuances and inferences that prior facts I guess would look at. But, obviously this is not the same situation as Fargus. I obviously don't think it's nothing like Fargus, but certainly there are distinguishing elements. What I think the similarity is is that juries need to decide these questions when there needs to be an assessment of what really would be reasonable or I guess when you look at Wilf and Monk what is a heightened degree of unreasonableness in confronted with the conscious choices that he could make. And you say it's conscious because even though he was sliding on the ice and he was making a quick decision, it was a conscious decision. Right. Now the jury may say because it was a quick decision even though it was conscious we don't find that it's a willful one but that's what we have the juries for rather than deciding all these cases by summary disposition. Thank you. Thank you. Good afternoon. May it please the Court. My name is Deneen Strino. I'm here today representing the appellee Cody Cundiff who is undisputed was a volunteer firefighter for the Thomas Borough Fire Protection Agency at the time of this accident. Addressing the issue first of whether or not he is afforded the immunities and the privileges granted under the Tort Immunity Act in this particular section is our position that he is. The Tort Immunity Act and the relevant section here 106 are very clear. It's very clear that a public entity or a public employee, volunteer as that statute has been interpreted are afforded the privileges of these provisions and immunity when responding to an emergency call. Now that's really what the crux of Appellant's complaint is in this case. Was he responding to the emergency call? All the evidence in the record which is undisputed come from the fire department's bylaws You certainly have to be more careful driving a private vehicle than if you're driving a vehicle with a siren and flashing lights on it. Well, I think you have to be careful no matter what vehicle you're driving. But the fact of the matter is when he is driving his personal vehicle with respect to responding to an emergency call, which all the evidence is undisputed that the emergency call begins from the moment in time he receives the fire page from the MEDCAD system. The bylaws say that, the standard operating procedures say that and that is what his duties, that's what he is responsible for doing. Had he not done that, there may be someone complaining about that as well. But the fact of the matter is because he was in the midst of an emergency call and as Justice Cook you recognized in Young that just because the emergency call never comes to fruition doesn't mean that he wasn't involved in it at the time he received the call. That's when this accident happened and he's covered by the statute. Today, Appellant's Counsel didn't bring up any of the conflict or whether or not there's a conflict between the vehicle code and the Tort Immunity Act. I go into that at length in my brief that's a square peg in a round hole in this circumstance. I don't believe there is a conflict and I think I set forth the basis for that in my brief. There are some cases that say there is. Well, those cases are courts outside of this particular jurisdiction. Those cases are in the minority and also if you take a very close read to that statute the motor vehicle statute that he wants to impose upon this situation. It requires an emergency vehicle. It requires, it says shall. This motor vehicle code requires a shall provision of operating an emergency vehicle. So you have to be more careful driving an emergency vehicle with flashing lights than you do driving your personal vehicle? No, because neither statute talks about being more careful or less careful. Both statutes talk about the motor vehicle statutes tells emergency vehicle operators how to operate and if they become a certain situation how they should proceed. Juxtaposed against that is the act, which is if you're in the midst of an emergency call you are immune from negligence if you are going to the emergency and been called to the emergency. The two have nothing to do with each other in this case. They can't possibly be compared in this particular case. Again, I think you're saying that the motor vehicle code only applies to operation of emergency vehicles. That's correct. And it sets out what you have to do regarding stoplights and things like that. But it doesn't apply to somebody driving a personal vehicle. Which sort of amazes me that you have a higher standard if you're driving an emergency vehicle with flashing lights than if you're driving your personal car. But it's this particular section of the motor vehicle code that has been the subject of a conflict in the appellate courts. It's this section. It's only this section that has been raised. And this particular section says emergency vehicles with oscillating lights and sirens. Mr. Conduff of course has to abide by the rest of the motor vehicle code, but this particular section that's at issue here is not applicable to him in this situation. Other than that we have at issue here is the issue of whether or not Cody Conduff's actions were willful and wrong. This court has addressed this issue before under very different circumstances as you suggested. Willful and wrong conduct can be the subject of summary judgment grant upon the appropriate facts. I do not stand before this court to say that under any given set of circumstances if someone's going 35 miles an hour through an intersection, that's not willful and wrong. What I stand before the court can say is that every individual case has to be determined differently. And in Young v. Forges you had three conflicting, disputed versions of what happened. In this case, you have one version. It's uncontradicted. There's really no undisputed facts in this case. Mr. Conduff, for the first time when he applied his brakes, realized there was ice. Instead of plowing into the back of a vehicle occupied by two persons and surely injuring them or careening into a ditch and surely injuring others and himself he chose to move around that vehicle. The brakes were not working. He was in a slide. He did what he could do in a panic to get through to what he had to do and hope for the best. That's what he said. Did he have conscious disregard for the appellants? In this case, he did not. He did not see them. The restatement second of torts talks about that recklessness is a heightened burden. It's a heightened state of mind. It's a state of mind that necessarily requires some sort of notice or some sort of knowledge. Did he have knowledge of any car on Route 45 that he disregarded? No. Did he have knowledge of the Hatterbergs vehicle on Route 45 that he disregarded? No. But did he have knowledge of those people sitting in that car that he could not stop for? Yes. This is the actions of a man who actually acted with regard to other safety. And all the facts in this case suggest that Mr. Cundiff did not act willfully and wantly. And for the jury to reach such an inquiry there would have to be, as this Court has recognized, disputed facts. We don't have that here. There could also be some sort of admission by Mr. Cundiff that he saw them and he didn't bother to try to avoid them. We don't have that here. We have what appellants want to suggest are inferences, but in actuality they're not. What appellants want to suggest in this briefing are really assumptions or speculations. Which say, what would have happened if he applied radical steering or radical braking? We don't know. A jury will never know. That's asking us to have the jury second guess. It's asking us to ask for a jury verdict based on speculation, conjecture, and surmise. Which is improper. He wants us to speculate about what Cody could have done in that snap second when he is in the slide and his brakes already failed without notice of any impending danger in front of him. This was an unfortunate accident. Cody serves his state. He serves his community as a volunteer firefighter. He attempted to respond to an emergency with three car collisions, cars off the road. And unfortunately this accident happened. But there's not one suggestion in this record that he acted with any reckless disregard for the appellants individually. And the only evidence we do have is that he acted with regard to the safety of the only two people he saw. Was he speeding as he approached the intersection? He was not speeding. No evidence of speeding in this record. Going 55 miles an hour? He was not going 55 miles an hour. I thought that's what he... No, he was going 40, he was going 55, then he hit his brakes, he slowed to 40 to 35, and then when he hit his brakes a second time to try to stop again, he was already below the speed limit. So he was never violating the speed limit at any time. What was the speed limit? 55. And this case, again, is very different from Forgis because in Forgis there was a citation and a guilty plea to a ticket. We don't have that in this case either. So I don't suggest that this court propound a position where there is always a volunteer firefighter responding to an emergency call and his personal vehicle is not guilty of willful and wanton negligence if and case he gets in an accident and he's going 35 and can't slide on ice. I don't suggest that. What I suggest is that we have a situation with willful and wanton conduct where it should be a case-by-case analysis. And the case-by-case analysis in this case bends in favor of the appellee here because there's just not the kind of facts that constitute that he was acting recklessly and there's not the kind of facts that he had knowledge that he was going to hurt anyone and the facts are that he tried to avoid that. And for those reasons I ask that this court affirm both the dismissal of the negligence counts against my clients and also the grant of summary judgment in favor of Mr. Pando. Unless you have any other questions? There don't appear to be any. Okay, thank you. With respect to the arguments concerning willful and wanton conduct on page 8 of the appellee's brief they put some things in there to try to make this case more similar to that Joyner case where the vehicle hits the ice and goes out of control. In their brief they state, unable to stop conduct steered around the stop vehicle and away from a very steep ditch in order to avoid a collision and prevent injuries to the passengers and himself. Unable to regain control he held the steering wheel tight and moved through the northbound lanes. I think the undisputed facts are that that's not exactly or isn't what happened. He indicated that he hit the brakes he felt he was sliding tried again he felt he was sliding was he unable to stop who knows he felt he was unable to stop that's when this conscious decision making is going on albeit obviously in a quick period of time. He obviously didn't have no control over his vehicle. He wasn't out of control. He had enough control of the vehicle enough traction on the roadway to take a vehicle that was going between 55 miles an hour and maybe 35 or 40 miles an hour coming upon this intersection and maneuvering it in a sharp maneuver at that speed into the oncoming traffic lane and at that point in time his specific testimony is there's nothing that would suggest he couldn't steer, he couldn't see he couldn't brake or do anything at that point in time. So this isn't a situation where he came upon the ice and bait took its course with the vehicle. He was able to make a decision to steer around and he had control so that he was able to do that. And I believe really one of the questions that you asked Justice Cook was what I was trying to drive home through this whole argument at least the question you asked with your private vehicle in getting to the emergency equipment there is the basis for a distinction versus when you actually get that emergency vehicle you get that emergency equipment or if the emergency is such and the resources of the volunteer fire department are such that you have to follow in your personal vehicle or take your personal vehicle or go to the scene in your personal vehicle those are different circumstances. So because of that the factors of being careful to the point of following the motor vehicle laws should be applicable in this case so that negligence is a viable theory. I hope I in no place and if I did I have to apologize profusely for it there's no question that this is a good kid he's a volunteer fire person there's a lot of young kids that are doing things that wouldn't be as good as this particular vocation and hobby but nevertheless the question is given what duties all good citizens have regardless of what good deeds they do should the motor vehicle laws the general negligence laws apply we think they should in this case we think that there is sufficient distinction from some of the cases cited here we believe that there are reasons that the other appellate district the 5th district's decision on the conflict should apply and that there is a basis for the jury to decide Thank you Thank you counsel we will take this matter under advisement and stand in recess until further call